(C.D. 3866)

F. B. VANDEGRIFT & Co., INC. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided July 15, 1969)

*Allerton deC. Tompkins* for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Sheila N. Ziff* and *Steven R. Sosnov*, trial attorneys), for the defendant.

Before Rao and Ford, Judges

Rao, Chief Judge: The merchandise involved in this case consists of belting for machinery imported from West Germany, which was assessed with duty at 25 cents per pound plus 30 per centum ad valorem under item 355.80 of the Tariff Schedules of the United States under the provision for woven or knit fabrics of textile materials, coated or filled with rubber or plastics material, or laminated with sheet rubber or plastics, of man-made fibers.

Several claims were made in the protest but those presently relied on are that the merchandise is dutiable at 12.5 per centum ad valorem under item 773.35, as belting for machinery, of rubber or plastics, not containing vegetable fibers, or at 17 per centum ad valorem under item 774.60, as articles not specially provided for, of rubber or plastics, other.

The pertinent provisions of the tariff schedules are as follows:

|  | Woven or knit fabrics (except pile or tufted fabrics), of textile materials, coated or filled with rubber or plastics material, or laminated with sheet rubber or plastics, except foam or sponge sheet: |  |
|---|---|---|
|  | *    *    *    *    *    *    * |  |
| 355.80 | Of man-made fibers_____ | 25¢ per lb. +30% ad val. |
| 773.35 | Belting and belts, for machinery, of rubber or plastics and not containing vegetable fibers_____ | 12.5% ad val. |
|  | Articles not specially provided for, of rubber or plastics: |  |
|  | *    *    *    *    *    *    * |  |
| 774.60 | Other _____ | 17% ad val. |

At the trial, plaintiff called Daniel Frysinger, vice president and general manager of J. E. Rhoads & Sons, the importer herein. He testi-

fied that he had been with the firm for 11 years and that it handles belting of various types, including leather and plastic belting. He said that he was personally familiar with the merchandise involved herein, had contacted the supplier in Germany in 1958, and had made three trips to the plant. He had handled the material, visited customers' plants, talked with distributors, and had seen its end use. He identified samples representative of the imported merchandise as to type of material, but not length and width, as follows:

Exhibit 1 – B 08 belting, one side yellow rubber coated, the other side free of rubber.

Exhibit 2 – B 08 belting, described on the invoice as one side rubber coated, but actually having both sides coated.

Exhibit 3 – B 08 belting, yellow/black.

Exhibit 4 – C 10 belting, described on the invoice as one side rubber coated, but actually having both sides coated.

Exhibit 5 – C 10 belting, yellow with no rubber coating.

The witness testified that the length of the imported articles ranged from 49.50 to 61.80 meters and the widths from 508 to 610 millimeters.

Mr. Frysinger testified that he had been handling such merchandise since 1958, had sold it all over the United States and knew its purpose. He said that it was used on machinery around pulleys to transmit power from one place to another or to transport an item from one place to another. He described the characteristics making it particularly useful for belting purposes as follows:

* * * This particular material, with the oriented nylon ribbon between the nylon fabric, contains great tensile strength and flexibility. With the variety of coatings which we are able to obtain, we get good coefficient of friction, good abrasion resistance, resistance to most of the common greases, oils and solids which you find in industry. We are able, with the antistatic coating, to eliminate static electricity when it is used as conveyer tapes in the printing industry.

It is easily made endless, which is, which means that customers do not have to dismantle their machinery to install an endless belt.

He said that the merchandise is able to withstand temperatures from 0 to 212° F. and the plies do not separate. His firm cuts the material into widths ranging from ¼ inch to 24 inches and to specified lengths. The ends may be beveled and cemented under heat and pressure to make an endless belt.

The witness testified that the imported articles were made up of at least three layers consisting of woven fabrics on the outside, with nylon ribbon in between. These are laminated or cemented together

under heat and pressure to make one unit, whose layers cannot be readily separated. The witness had attempted to take apart a sample (exhibit 6) by applying methanol and using pliers to peel back the layers. He stated that a portion of the band or sheeting had adhered to the outer surface. According to the witness, all the merchandise contained at least one layer of polyamid bands and one of woven nylon fabric and is in chief value of the woven nylon fabric. He also testified that the merchandise is belting and that when it is cut up it is known as a belt.

There was received in evidence, as defendant's exhibit A, a report of the Customs Laboratory at Philadelphia which contains the following statement:

> The sample marked "C-10 extra" is a 3-ply sheet consisting of a central core of nylon type synthetic resin sheeting to each surface of which is fused a sheet of woven nylon fabric. The outer surfaces of the fused sheet are covered with a thin layer of nitrile type synethetic rubber.

Irving Sporn, assistant chief chemist at the Customs Laboratory in Philadelphia, testified that he had prepared the laboratory report which reflected his analysis of a sample which was received in evidence as exhibit B. In order to identify the composition of the article he had removed the outer rubber coating. He peeled away a layer of a woven fabric later identified as being composed of nylon, and exposed another layer underneath it of a solid plasticlike material later identified as nylon. After that was peeled away, another layer of woven fabric coated with a yellow rubber composition was exposed. In other words, the merchandise consisted of two layers of woven nylon fabric, two layers of a rubber coating, and an inner plastic core. When he removed the sheeting from the woven fabric, none of the sheeting adhered to the fabric.

The witness testified that the word "fused" in his report meant very closely joined. The term "nylon type synthetic resin sheeting" was used to differentiate between a solid piece of plastic and the part identified as "woven fabric."

The following facts were stipulated at the trial:

> * * * that the merchandise referred to in Defendant's Exhibit A as "woven nylon fabric," is woven from fibers formed by extrusion, from substances derived by man from noncellulosic materials by chemical processes, such as, but not limited to, polymerization and/or condensation. The noncellulosic material consists of polyamid resins of polymerized organic chemicals formed by condensation. They contain, as an essential ingredient, an organic substance of high molecular weight capable, at some stage during processing into finished articles, of being molded or shaped by flow, and are solid in the finished article.

> *      *      *      *      *      *      *

The monofilaments comprising the yarn of which the woven fabric referred to in said laboratory report, Defendant's Exhibit A, is made, are under 0.06 inches in maximum cross-sectional dimension.

\* \* \* all of the articles in protest, whether identified as "B 08" or "C 10" are in chief value of textile materials referred to in the laboratory report as "woven nylon fabric."

\* \* \* the merchandise under protest, as previously identified, does not contain vegetable fibers.

\* \* \* the article referred to in Defendant's Exhibit A as "nylon type synthetic resin sheeting," consists of plastics, as defined in the Tariff Schedules of the United States.

It is clear from the record presented that the imported merchandise is belting for machinery composed of layers of rubber or synthetic rubber material, woven nylon fabric, and plastic sheeting, or of layers of woven nylon fabric and plastic sheeting, which have been fused together, and that it is in chief value of woven nylon fabric.

Plaintiff claims the merchandise is properly classifiable under item 773.35, *supra*, as belting of plastics on the ground that the woven nylon fabric is made of yarn composed of monofilaments which conform to the definition of plastics and synthetic plastics materials in the headnotes to part 1C and 4A of schedule 4.[1] These definitions include as plastics or synthetic plastics materials, products formed by the condensation, polymerization, or copolymerization of organic materials and to which plasticizers, fillers, colors, or extenders may have been added. They are products which are capable, at some stage during

---

[1] Schedule 4, part 1, subpart C headnotes :

3. The term *"plastics materials"* in item 405.25 embraces products formed by the condensation, polymerization or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not limited to, phenolic and other tar-acid resins, styrene resins, alkyd and polyester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastic materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules, solutions, emulsions, and other basic forms not further processed.

Schedule 4, part 4, subpart A headnotes :

2. The term *"synthetic plastics materials"*, in this subpart, embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. These products contain as an essential ingredient an organic substance of high molecular weight; are capable, at some stage during processing into finished articles, of being molded or shaped by flow; and are solid in the finished article. The term includes, but is not limited to, such products derived from esters of acrylic or methacrylic acid; vinyl acetate, vinyl chloride resins, polyvinyl alcohol, acetals, butryal, formal resins, polyvinyl ether and ester resins, and polyvinylidene chloride resins; urea and amino resins; polyethylene, polypropylene, and other polyalkene resins; siloxanes, silicones, and other organo-silicon resins; alkyd, acrylonitrile, allyl, and formaldehyde resins; and cellulosic plastics materials. These synthetic plastics materials may be in solid, semi-solid or liquid condition such as flakes, powders, pellets, granules, solutions, emulsions, and other basic crude forms not further processed.

processing into finished articles, of being molded or shaped by flow, and are solid in the finished article.

Defendant contends, however, that the individual monofilaments, the nylon yarn, and the woven nylon fabric manufactured therefrom, are "textile materials" as defined in schedule 3, headnote 2(a) ;[2] that the term "plastics" does not include "textile materials" and that therefore the belting herein is not classifiable under item 773.35.

According to the definition in said headnote, "textile materials" include man-made fibers and fabrics and articles processed therefrom. The term "man-made fibers" refers to filaments, strips, and fibers formed by extrusion or by other processes from substances derived by man from cellulosic or noncellulosic materials by chemical processes, such as, but not limited to, polymerization and condensation. (Schedule 3, part 1E, headnote 2.)[3]

While in a broad sense, the imported belting is composed of plastics, it is more specifically described as composed of textile materials woven from man-made or plastic fibers. Articles of plastic are not always, and perhaps not usually, in the form of woven fabrics. Schedule 7 itself makes separate provision in a number of instances for articles of man-made fibers or textile materials and the same articles of plastics: For instance—

| | |
|---|---|
| Headwear, of man-made fibers | Item 703.05–703.15 |
| Headwear, of rubber or plastics | Item 703.70–703.72 |
| Gloves and glove linings of textile materials | Item 704.05–704.95 |
| Gloves of rubber or plastics | Item 705.84–705.86 |

---

[2] Schedule 3 headnotes :
  2. For the purposes of the tariff schedules—
    (a)  the term *"textile materials"* means—
        (i)  the fibers (cotton, other vegetable fibers, wool and hair, silk, and man-made fibers) provided for in part 1 of this schedule,
        (ii)  the yarn intermediates and the yarns provided for in part 1 and part 4 (elastic yarns) of this schedule,
        \*          \*          \*          \*          \*          \*          \*
        (iv)  the fabrics provided for in part 3 and part 4 of this schedule,
        \*          \*          \*          \*          \*          \*          \*
        (vi)  articles produced from any of the foregoing products ;
[3] Schedule 3, part 1, subpart E headnotes :
    2.  (a) For the purposes of the tariff schedules, the term *"man-made fibers"* refers to the filaments, strips, and fibers covered in this subpart.
        (b)  Subject to the limitations set forth in headnotes 1 and 3 of this subpart, the respective provisions in this subpart for filaments, strips, and fibers cover such articles whether they are formed by extrusion or by other processes from substances derived by man from cellulosic or non-cellulosic materials by chemical processes, such as, but not limited to, polymerization and condensation ;

| | |
|---|---|
| Luggage and handbags of textile materials | Item 706.20–706.24 |
| Luggage of reinforced or laminated plastics | Item 706.30 |
| Furniture of textile materials | Item 727.45 |
| Furniture of rubber or plastics | Item 727.47–727.48 |

Thus, headnote 1 to schedule 3,[4] excluding from schedule 3, footwear, headwear, gloves, handbags, pillows, mattresses, and other articles of textile materials provided for in schedule 7, does not apply where the articles are provided for in schedule 7, as articles of plastics and not as articles of textile materials.

The same issue was presented recently in *R.H. Macy & Co., Inc.* v. *United States*, 62 Cust. Ct. 219, C.D. 3733, 297 F. Supp. 171 (1969) (appeal pending), where the competing provisions were items 365.85 and 367.60 of the textile schedule covering furnishings of man-made fibers, and item 772.35 of schedule 7 covering curtains, drapes, and like furnishings of rubber or plastic. The court held that the term "plastic" as employed in part 12 of schedule 7, described a form as well as a substance and did not cover plastic materials which had been converted into textile materials. The court said:

> A yarn which was produced from a basic plastic substance has by that process of manufacture taken on the status of a textile material from which a textile product will be produced, and for tariff purposes may no longer be considered a "plastic" but rather a man-made fiber. (Cf. *Tide Water Oil Company* v. *United States*, 171 U.S. 210 and *L. Mendelson Co.* v. *United States*, 9 Cust. Ct. 256, C.D. 704). Textile fibers (of which man-made fibers are one form) and products made therefrom are provided for in schedule 3 of the Tariff Schedules of the United States, and "furnishings" made of such textile materials are especially provided for in items 365.85 and 367.60, which classification has been applied by the customs authorities to the present importations.

> By contrast subpart A of part 5 of schedule 3, headnote 3, in referring to "rubber, plastics, or other nontextile materials", expresses plainly what we perceive to be the congressional intention to distinguish between man-made fibers and fabrics having a plastic base from non-textile plastics materials. And schedule 7 itself provides separately for example for both headwear of man-made fibers, and headwear of rubber or plastics. Cf. items 703.05–703.15 with items 703.70–703.72.

We conclude that the instant belting, in chief value of textile materials, is not classifiable under item 773.35 or item 774.60.

---

[4] Schedule 3 headnotes:

1. This schedule does not cover—

\* \* \* \* \* \* \*

(iv) footwear, headwear, gloves, handbags, pillows, mattresses, and other articles of textile materials provided for in schedule 7.

Plaintiff claims, however, that the merchandise here is not classifiable under item 355.80 because it has not been coated, filled, or laminated, and the layers have been so joined together that they cannot be separated and form one solid sheet or band of plastics.

The witness Frysinger described some of the samples as rubber coated and some as uncoated. His testimony also refers to "the variety of coatings" that could be obtained. Mr. Sporn also characterized the outer layers as rubber coating. All of the samples except exhibit 5 appear to have a yellow or black coating or layer outside the woven fabric layer.

Headnote 2 to part 4C of schedule 3 defines "coated or filled" as follows:

> 2.  For the purposes of the tariff schedules—
>     (a) the term *"coated or filled"*, as used with reference to textile fabrics and other textile articles, means that any such fabric or other article has been coated or filled (whether or not impregnated) with gums, starches, pastes, clays, plastics materials, rubber, flock, or other substances, so as to visibly and significantly affect the surface or surfaces thereof otherwise than by change in color, whether or not the color has been changed thereby; * * *

See also the following definitions from Webster's Third International Dictionary (1968 edition):

> coated
> c *of cloth:* covered or impregnated with a durable chemical or rubber compound (as of oilcloth)

> coat
> 4: a layer of any substance covering another * * *

> coating
> 1: a layer of any substance used as cover, protection, decoration, or finish * * *

We conclude that the woven fabric in the imported belting, except that represented by exhibit 5, has been coated with rubber or plastics.

Although the collector's report mentions only the provision in item 355.80 referring to woven fabrics of textile materials, coated or filled with rubber or plastics, the item also covers such fabrics laminated with sheet rubber or plastics. Mr. Sporn reported that the inner core of the material he examined was of nylon type synthetic resin sheeting and that the layers had been fused. Mr. Frysinger referred to the oriented nylon ribbon between the layers of nylon fabric and stated that they were laminated or cemented together under heat and pressure. Such articles are laminated and fall within the several descriptive provisions of the superior heading to item 355.80. Cf. *Sommers Plastic Products Co.* v. *United States*, 58 Cust. Ct. 409, C.D. 3002, 268 F. Supp. 490 (1967).

While the layers have been fused together so as to form one unit, they can be taken apart and the woven fabric identified. Exhibit B demonstrates, contrary to plaintiff's argument, that the woven layer has not been so processed as to have lost its character as a fabric. Obviously the provision for woven fabric, laminated with sheet rubber or plastics, contemplates that the layers will be fused to form a unit. It is sufficient if the component materials of the layers are known.

Since it has been stipulated that the articles herein are in chief value of woven nylon fabric and the record shows that the fabric has been coated with rubber or plastics materials or laminated with plastics, they fall within the provisions of item 355.80, *supra.*

For the reasons stated, the protest is overruled and judgment will be entered for the defendant.